**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 20-2725 & 2885
_____

KAREN HEPP,
Appellant in 20-2725

v.

FACEBOOK; IMGUR INC; REDDIT INC; GIPHY INC,
WGCZ S.R.O.

Imgur Inc.; Reddit Inc., Appellants in 20-2885

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-19-cv-04034)
District Judge: Honorable John M. Younge
_____

Argued on June 2, 2021

Before: HARDIMAN, PHIPPS, and COWEN, *Circuit
Judges*.

(Filed: September 23, 2021)

Samuel Fineman [Argued]
Cohen Fineman
199 Marlton Pike East, Suite 4
Cherry Hill, NJ 08003

    *Counsel for Karen Hepp*


Joseph C. Gratz
Vera Ranieri [Argued]
Aditya V. Kamdar
Durie Tangri
217 Leidesdorff Street
San Francisco, CA 94111

    *Counsel for Imgur Inc. and Reddit, Inc.*


Dennis L. Wilson
Kilpatrick Townsend & Stockton
1801 Century Park East, Suite 2300
Los Angeles California 90067

Tywanda Lord
Kilpatrick Townsend & Stockton
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309

Barry L. Cohen
Royer Cooper Cohen Braunfeld
100 N. 18th Street, Suite 710
Philadelphia, Pennsylvania 19103

Craig S. Primis [Argued]

Kirkland & Ellis
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004

     *Counsel for Facebook, Inc.*


Michael T. Zeller [Argued]
Quinn Emanuel Urquhart & Sullivan
865 S. Figueroa St. 10th Floor
Los Angeles, California 90017

Samuel W. Silver
Bruce P. Merenstein
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA 19103

     *Counsel for WGCZ SRO*


Duncan Crabtree-Ireland
Danielle S. Van Lier
SAG-AFTRA
5757 Wilshire Blvd., 7th Floor
Los Angeles, CA 90036

Ira L. Gottlieb
Bush Gottlieb, A Law Corporation
801 North Brand Boulevard, Suite 950
Glendale, CA 91203-1260

     *Counsel for Amicus SAG-AFTRA, in support of Karen Hepp*


Kit Walsh

Coryanne McSherry
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109

> *Counsel for Amici Electronic Frontier Foundation, the Copia Institute, iFixit, Engine, and Center for Democracy and Technology, in support of Imgur, Inc., Reddit, Inc., Facebook, Giphy, Inc., and WGCZ SRO*

————————

OPINION OF THE COURT

————————

HARDIMAN, *Circuit Judge*.

Section 230 of the Communications Decency Act of 1996 bars many claims against internet service providers. *See* 47 U.S.C. § 230(c). But Section 230 does not bar intellectual property claims. § 230(e)(2). The question presented in this appeal is whether a Philadelphia newscaster's state-law claims for violating her right of publicity are precluded by § 230. Because those claims are encompassed within the intellectual property carve-out, § 230(e)(2), we hold they are not precluded.

I

Appellant Karen Hepp has worked in the news industry her entire adult life. Presently, she hosts FOX 29's *Good Day Philadelphia*. As is often the case for television personalities, Hepp's professional success as a newscaster depends in part on her reputation and social media following. She has built an "excellent reputation as a moral and upstanding community

4

leader" and has amassed a sizeable social media following. *See* App. 59–61. So Hepp's endorsement can be valuable. Naturally, that value depends on her ability to control the use of her likeness.

In 2018, Hepp was told by coworkers that her photograph was making its way around the internet. The image depicts Hepp in a convenience store, smiling in the center of the frame's foreground. But the photograph was taken without Hepp's knowledge or consent. She knows neither the convenience store's location nor how the image was posted online. And she never authorized the image to be used in online advertisements for erectile dysfunction and dating websites.

Hepp's allegations included two sets of posts featuring her photograph. She alleged each violated her right of publicity under Pennsylvania law.

The first post—which was an advertisement to a dating app, FirstMet—appeared on Facebook, which is one of the world's largest social media companies. The advertisement used Hepp's image to promote its dating service. And it encouraged Facebook users to "meet and chat with single women near you."

Second, a Reddit thread linked to an Imgur post of the photo. Reddit is an online forum that allows users to create communities organized around topics. Within each community, users can start conversations by making an initial post. Other users can note their approval by "upvoting" the post. *See generally* https://www.redditinc.com/; https://www.reddithelp.com/hc/en-us/categories/200073949-Reddit-101. Imgur is a photo sharing website where users share digital images. *See generally* https://imgurinc.com/. In this

case, someone uploaded Hepp's image to Imgur. Then a Reddit user posted a link to the Imgur post. The Reddit post spurred indecent user commentary and was upvoted over one hundred times.

Hepp sued Facebook, Reddit, and Imgur. The complaint, as amended, alleges two state-law claims: one for violating Pennsylvania's right of publicity statute, 42 PA. CONS. STAT. § 8316, and the other for violating its common law. The companies each moved to dismiss the amended complaint. The District Court dismissed Hepp's case with prejudice, holding all three companies were entitled to § 230 immunity. The Court held the § 230(e)(2) limitation—which prevents § 230 from affecting "any law pertaining to intellectual property"—did not apply to violations of state law.

Hepp appealed. And Imgur and Reddit filed a joint cross-appeal to challenge personal jurisdiction.

II

The District Court, exercising diversity jurisdiction under 28 U.S.C. § 1332, dismissed Hepp's amended complaint with prejudice. So our jurisdiction lies under § 1291, and our review is plenary. *See Martinez v. UPMC Susquehanna*, 986 F.3d 261, 265 (3d Cir. 2021).

III

We begin with personal jurisdiction. Facebook conceded it was amenable to suit in the District Court. But Reddit and Imgur claimed the District Court lacked personal jurisdiction over them. We agree. Applying the Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial*

6

*District Court*, 141 S. Ct. 1017 (2021), we hold the District Court did not have personal jurisdiction over Reddit or Imgur.

Personal jurisdiction can be general or specific. General jurisdiction extends to all claims against a defendant and exists where a company is "essentially at home." *Id.* at 1024. Because none of the companies are at home in Pennsylvania, we turn to the Supreme Court's specific jurisdiction doctrine, which extends only to particular claims. *Id.*

There are two prongs to the specific jurisdiction analysis. First, there must be purposeful availment: minimum contacts with the forum state that show the defendant took a deliberate act reaching out to do business in that state. *Id.* at 1024–25. Second, the contacts must give rise to—or relate to—plaintiff's claims. *Id.* at 1025. Imgur and Reddit concede that the first prong is satisfied here. Oral Argument at 47:28–47:34. So we focus on the second.

For the contacts to satisfy the second prong, there must be "a strong 'relationship among the defendant, the forum, and the litigation.'" *Id.* at 1028 (quoting *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984)). Here, that connection is too weak.

Consider the strong connection in *Ford Motor*. That case involved products liability suits stemming from car accidents in Minnesota and Montana. *Id.* at 1022. The contacts between those states and the company were legion. By "every means imaginable" Ford urged state residents to buy the types of cars in the accidents. *Id.* at 1028. The company "systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States." *Id.* So there was the requisite

7

strong relationship among the defendant, the forum, and the litigation. *Id.*

In contrast, Hepp's allegations focus on how Imgur and Reddit purposefully availed themselves of the Pennsylvania market. But those contacts do not relate to this litigation. Hepp alleges Imgur and Reddit targeted their advertising business to Pennsylvania. And she alleges Imgur has an online merchandise store that sells products to Pennsylvanians. Finally, she points to Reddit's premium membership business and an online community organized around Philadelphia. But none of these contacts forms a strong connection to the misappropriation of Hepp's likeness. Hepp did not allege the merchandise featured her photo. Nor did she allege Imgur and Reddit used her likeness to sell advertising. Finally, she did not claim the photo was taken, uploaded, or hosted in Pennsylvania.

In sum, the alleged contacts do not relate to misappropriation, and the alleged misappropriation does not relate to any of the contacts. Because Hepp failed to establish the strong connection present in *Ford Motor*, we hold the District Court lacked personal jurisdiction over Imgur and Reddit.[1]

---

[1] Hepp also named a Czech company, WGCZ, in connection with a pornographic website that hosted her image after a user posted it to an illicit gallery. The District Court granted WGCZ's motion to dismiss because it did not operate the website during the relevant time. Hepp concedes WGCZ did not run the pornography website at issue. Oral Argument at 1:18:50–1:19:05. So there were no relevant contacts to

8

IV

With Facebook as the only remaining party to this appeal, we consider whether it is immune under § 230.

A

Passed in 1996, Section 230 of the Communications Decency Act was intended to promote the internet. *See* 47 U.S.C. § 230(b). It specifically sought to preserve "the vibrant and competitive free market"—"unfettered by Federal or State regulation." § 230(b)(2). The Act also promoted filtering technology and the vigorous enforcement of criminal obscenity laws. § 230(b)(5). In essence, Congress fostered a largely unregulated free market online while snuffing out certain objectionable content.

Section 230(c) strikes the balance. It provides "Good Samaritan" protection, which enables "blocking and screening of offensive material" as follows:

> (1) TREATMENT OF PUBLISHER OR SPEAKER. No provider or user of an interactive computer service shall be treated as the publisher or speaker of

---

establish personal jurisdiction, and the District Court correctly held it lacked personal jurisdiction over WGCZ. The District Court also concluded § 230 barred Hepp's claims, so it denied her leave to add the appropriate website owner. As explained below, we disagree with the District Court about § 230. *See infra* Part IV. So while Hepp's suit against WGCZ was properly dismissed for lack of jurisdiction, we will vacate the District Court's decision denying leave to amend.

9

any information provided by another information content provider.

(2) CIVIL LIABILITY. No provider or user of an interactive computer service shall be held liable on account of—

    (A) any action . . . to restrict access to . . . objectionable . . . [material]; or

    (B) any action taken to enable . . . the technical means to restrict access to material described in paragraph [A].

§ 230(c). This provision bars attempts to treat websites as publishers or speakers of content posted by others. *Id.* And it encourages companies to host and moderate third-party content by immunizing them from certain moderation decisions. *Id.* In other words, it forgoes some publisher liability and paves the way for service providers to make their own moderation decisions.

Lest the liability provisions in § 230(c) be read too broadly, however, the Act also carves out five limitations in § 230(e). Subsection (e) ensures several legal domains remain unaffected by § 230(c). Most relevant here, § 230 has "[n]o effect on intellectual property." § 230(e)(2). Indeed, "[n]othing in [§ 230] shall be construed to limit or expand any law pertaining to intellectual property." *Id.* Similarly, § 230(c) does not affect federal criminal law, communications privacy law, or sex trafficking law. § (e)(1), (4), (5). Among these

10

limitations, state law is mentioned several times. For instance, in the communications privacy and sex trafficking domains, "similar" or coextensive state laws also fall outside § 230(c)'s scope. *See* § (e)(4), (5). Finally, the Act also provides a general state law limitation, stating consistent state laws are not affected. *See* § 230(e)(3). In sum, § 230(e) cabins the reach of the Act's liability provisions.

This appeal turns on whether § 230(c) makes Facebook immune or whether § 230(e)(2) places Hepp's claims outside § 230(c)'s reach. We resolve that issue in two steps. First, we consider whether § 230(e)(2) can apply to any state law claims. We then turn to whether § 230(e)(2) applies to Hepp's statutory claim.

B

1

In the twenty-five years since the Communications Decency Act was passed, there are precious few cases interpreting § 230's intellectual property provision. The first noteworthy case is *Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007). There, a company sued internet message board providers alleging that some posts contained "false, misleading" content about the company's financial prospects. *See id.* at 415–16. The suit alleged violations of federal law, as well as trade name dilution in violation of Florida law. *Id.* at 417. The First Circuit treated the Florida dilution claim separately because "[c]laims based on intellectual property laws are not subject to Section 230 immunity." *Id.* at 422–23 (citing 47 U.S.C. § 230(e)(2)). As to the merits of the state-law claim, the court reasoned that "[t]rademark injury arises from an improper association

11

between the mark and [someone else's] products or services"—not from "criticism" leading to reputational harm. *See id.* at 423. Ultimately, the court held "that even though Section 230 immunity does not apply, the claim was properly dismissed as a matter of [Florida] trademark law" "because of the serious First Amendment issues that would be raised by allowing [Plaintiff's] claim." *See id.* at 423 & n.7. But that decision was necessary only because the court held § 230(e)(2) preserved the state law claim.

Soon after the First Circuit announced its decision in *Lycos*, the Ninth Circuit went the other way in *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007). There, a website operator alleged violations of federal law and a state right of publicity law. *Id.* at 1108. The district court dismissed the complaint and the Ninth Circuit affirmed, reasoning that federal intellectual property's scope was more established compared to state laws. *Id.* at 1118. And it explained the Act's policy goal—to insulate the internet from regulation—would be hindered if federal immunity varied based on state laws. *Id.* In the Ninth Circuit's view, § 230(e)(2) includes only "*federal* intellectual property." *Id.* at 1119 (emphasis added).

Another notable case is *Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009). There, record companies brought copyright claims under both state and federal law. *See id.* at 694 & n.5. The district court found the statute's text was clear. *Id.* at 703. It emphasized that Congress specified whether local, state, or federal law applied four times in subsection (e): once discussing federal criminal law, § (e)(1); twice in the general state law provision, § (e)(3); and again in the communications law context, § (e)(4). *Id.* The court held that "if Congress wanted the phrase 'any law pertaining to intellectual property' to actually mean 'any

12

*federal* law pertaining to intellectual property,' it knew how to make that clear, but chose not to." *Id.* Indeed, when Congress added the sex trafficking provision to the limitations in § (e), it referenced state laws twice more. *See* Allow States and Victims to Fight Online Sex Trafficking Act of 2017, § 4(a), Pub L. No. 115-164, 132 Stat. 1253, 1254 (2018) (adding 47 U.S.C. § 230(e)(5)).

With those precedents in mind, we turn to the parties' arguments.

2

In dismissing Hepp's amended complaint, the District Court adopted the Ninth Circuit's approach, holding that § 230(e)(2)'s limitation applies only to federal intellectual property. Facebook asks us to affirm that holding on three bases: the text and structure of § 230(e); the statute's own policy provision, § 230(b); and practical policy reasons.

Facebook's appeal to text and structure rightly urges us to read § 230 as an integrated whole. It suggests § 230(e) makes federal limitations the default and includes state laws only when specified. In other words, § 230(e)'s limitations are "directed to *certain* federal statutes and include state laws *only where they are coextensive with federal law*." Facebook Br. 17. Because state-law rights of publicity do not mirror an analogous federal law, Facebook argues Hepp's claim is not included in § 230(e)(2)'s intellectual property limitation.

Hepp counters that her claims arise under state law "pertaining to intellectual property," so § 230(c) cannot block them. And she cites *Atlantic Recording* as support. We agree with Hepp.

13

In our view, Facebook's interpretation strays too far from the natural reading of § 230(e)(2). We disagree that "any law pertaining to intellectual property" should be read to mean "any *federal* law pertaining to intellectual property." To support this "federal" reading, Facebook points to the statute's structure. But the structural evidence it cites cuts both ways. Facebook is correct that the explicit references to state law in subsection (e) are coextensive with federal laws. But those references also suggest that when Congress wanted to cabin the interpretation about state law, it knew how to do so—and did so explicitly. Because the evidence cuts both ways, the structure does not change the natural meaning. So the text and structure tell us that § 230(e)(2) can apply to federal and state laws that pertain to intellectual property.

Facebook also points to the policy enacted as part of § 230. As the company would have it, "Congress enacted Section 230 to avoid subjecting internet service providers to a web of inconsistent, 'fettering' state regulations like the laws governing rights of publicity." Facebook Br. 20–21. In support of this argument, Facebook focuses on § 230(b)(2). That provision seeks "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." § 230(b)(2). Facebook contends that because rights of publicity vary from state to state, increasing those protections would require censorship, limit free speech, and impair the online marketplace.

Facebook's premise is right: Congress enacted a pro-free-market policy. But its desired conclusion does not necessarily follow. Section 230's policy goals do not erase

state intellectual property rights as against internet service providers. Facebook errs by downplaying the role of property in markets. After all, state property laws—along with contract laws—enable "the resulting formation of effective markets." *Ford Motor*, 141 S. Ct. at 1029. Because state property rights can facilitate market exchange, interpreting the § 230(e)(2) limitation to include state intellectual property laws tracks Congress's pro-free-market goal. So the enacted policies do not require an alternate reading.

Third, Facebook offers policy arguments independent of the statute's text. According to Facebook, our reading would increase uncertainty about the precise contours of immunity in cases involving state intellectual property law. *See* Facebook Br. 29 (citing *Perfect 10*, 488 F.3d at 1119 n.5). But policy considerations cannot displace the text. For that reason, other courts have rejected such considerations, at least implicitly. In *Lycos*, the First Circuit decided the case on state law grounds because "Section 230 immunity does not apply." 478 F.3d at 423 n.7. And in *Atlantic Recording*, the district court took a similar approach. Well over a decade has passed since those cases were decided, yet neither Facebook nor its amici provide evidence that the rulings created the disarray they now predict.

Even if we considered policy outside the statute's text, it too could cut the other way. For example, if likeness interests are disregarded on the internet, the incentives to build an excellent commercial reputation for endorsements may diminish. *Cf. Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977) (explaining the economic theory underlying the right of publicity). That would cut against the statute's explicit policy objectives because information provided by promotional advertisements can enhance market

15

efficiency and vibrancy. So these policy arguments do not carry the day for Facebook either.

The parties present a clear split of persuasive authority. Facebook and its amici offer arguments based on the statute's text and policy considerations. But there are strong textual and policy arguments to the contrary. Because we adhere to the most natural reading of § 230(e)(2)'s text, we hold that § 230(e)(2) is not limited to federal laws. Simply put, a state law can be a "law pertaining to intellectual property," too.

C

Having held the § 230(e)(2) limitation applies to state intellectual property law, we turn to whether Hepp's statutory cause of action against Facebook constitutes such a claim.

1

Facebook argues the right of publicity is rooted in privacy. But it acknowledges the right has been categorized as "both a 'privacy right' . . . and a 'property right'." Facebook Br. 24–25 (quotation omitted). Amici supporting Facebook take a different tack. They argue we should read "any law pertaining to intellectual property" to "embrace its traditional core"—exclusively federal copyright and patent law. EFF Br. 8 & n.5 (excluding trademarks). These amici also warn us of the "parade of horribles," EFF Br. 19, that would ensue should we adopt Hepp's interpretation, especially limitations on free speech.

For her part, Hepp contends the right to publicity is an intellectual property right. *See* Hepp Br. 11. And she argues that she "has dedicated considerable time, effort and money

16

into building her brand." Hepp Br. 17. Her amicus adds that state courts have long recognized individuals have property interests in their personas. They cite a 1907 case involving the legendary Thomas Edison. SAG Br. 19. There, the New Jersey court confirmed Edison could enjoin the use of his picture as an endorsement for a product he did not sell. *See Edison v. Edison Polyform Mfg. Co.*, 67 A. 392, 394 (N.J. Ch. 1907). The court reasoned there was no distinction between the intellectual property protections afforded a person's name and trademark-like protections for likenesses used on a label. *See id.*

2

With these arguments in mind, we return to the statute's text. "Nothing in [§ 230] shall be construed to limit or expand any law pertaining to intellectual property." § 230(e)(2). So to decide whether Hepp's statutory claim against Facebook falls within § 230's intellectual property limitation, we must first establish whether it arises from a "law pertaining to intellectual property." That requires us to determine the meaning of the phrase "intellectual property." To do so, we turn to several sources.

For starters, *Black's Law Dictionary* defines "intellectual property" to include "publicity rights." *See Intellectual Property*, BLACK'S LAW DICTIONARY (11th ed. 2019); *accord id.* (7th ed. 1999). But not every dictionary does. For instance, *Ballentine's* defines the term as "those property rights which result from the physical manifestation of original thought." *Intellectual Property*, BALLENTINE'S LAW DICTIONARY (3d ed. 1968). Absent unanimity about the meaning of "intellectual property," we survey dictionary definitions. *See infra* Appendices A and B. *See generally* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 417

17

(2012) (explaining "comparative weighing of dictionaries is often necessary").

We begin by noting that "intellectual property" is best understood as a compound term—not a generic two-word phrase—because both legal and lay dictionaries treat it as such. *See infra* Appendices A and B. So we do not combine the definitions of "intellectual" and "property" in isolation; we interpret the compound term as a unified whole.

Second, legal dictionaries take precedence here. *See infra* Appendix A. Section 230(e) addresses the Act's impact on other laws. Because the term is used in a legal sense, the proper definition of "intellectual property" is the term's ordinary legal meaning. *See* SCALIA & GARNER, *supra*, at 73.

Our survey of legal dictionaries reveals "intellectual property" has a recognized meaning which includes the right of publicity. This conclusion follows from several observations.

First, two of the legal dictionaries explicitly list the right of publicity as an intellectual property right. *See infra* Appendix A (*Black's* and *McCarthy's*). These dictionaries are especially apt. *Black's* is renowned, and *McCarthy's* directly addresses the subject. A third legal dictionary, *Bouvier's*, provides more support. It sets forth a test that Pennsylvania's right of publicity statute satisfies because the statute grants people monopolies in their likenesses. The statute also provides for property-like relief, including the ability to obtain damages and injunctions against trespassers. *Compare* 42 PA. CONS. STAT. § 8316(a) (allowing for damages and injunctions when one's monopoly over her likeness is infringed), *with infra* Appendix A (*Bouvier's* test, requiring the same). In sum,

18

these definitions provide strong evidence that the term "intellectual property" includes Pennsylvania's statutory right of publicity.

Along with that explicit evidence, the legal definitions provide implicit support as well. For instance, one definition does not mention the right of publicity—but it includes trademark. *See infra* Appendix A (*Dictionary of Modern Legal Usage*). And that inclusion implies the right to publicity by analogy. *Cf. Zacchini*, 433 U.S. 562.

In *Zacchini*, the Supreme Court explained the right of publicity is an individual property right that is "closely analogous to . . . patent and copyright" because it focuses "on the right of the individual to reap the reward of his endeavors and [has] little to do with protecting feelings or reputation." *Id.* at 573. That focus also fosters market function by preventing the "unjust enrichment by the theft of goodwill." *See id.* at 575–76. And just as the right is "closely analogous" to patent and copyright, so too for trademark. Like the right to publicity, trademarks secure commercial goodwill. *USPTO v. Booking.com*, 140 S. Ct. 2298, 2302 (2020). Trademarks also foster the marketplace because they protect consumers' ability to distinguish between competitors. *Id.* So the right of publicity and trademark are close analogues.[2]

---

[2] For an academic account, see Stacey L. Dogan & Mark A. Lemley, *What the Right of Publicity Can Learn from Trademark Law*, 58 STAN. L. REV. 1161, 1164, 1190 (2006) (contending trademark law "is by far the closest analogy to the right of publicity").

And this analogy has been recognized in the courts for over a century. For example, a New Jersey court in *Edison* analogized the right in one's likeness to trademark. 67 A. at 393–94. That same year, a federal court granted an injunction to stop the "deceptive use of the Emperor Franz Josef's name and portrait" because it falsely implied his endorsement. *See Von Thodorovich v. Franz Josef Beneficial Ass'n*, 154 F. 911, 913 (C.C.E.D. Pa. 1907). More recently, the Florida Supreme Court explained the harm caused by a right to publicity violation is that "it associates the individual's name or . . . personality with something else." *Tyne v. Time Warner Ent. Co.*, 901 So. 2d 802, 806 (Fla. 2005) (cleaned up). Because trademark and the right to publicity are analogues, the legal definition including trademark also supports including the right of publicity as "intellectual property."

Like the legal dictionaries, many lay dictionaries explicitly include trademark. *See* Appendix B. So they too favor including the right to publicity within "intellectual property." It is true that a handful of definitions fail to mention trademark. *See infra* Appendix A (*Ballentine's*); *see also infra* Appendix B (*American Heritage* and *Merriam Webster*). But those three dictionaries are a distinct minority compared to the majority view that includes the right to publicity either explicitly or by analogy. And the statute's context favors adopting the majority view. Dictionary definitions tend to "state[] the core meaning of a term," omitting the "periphery." SCALIA & GARNER, *supra*, at 418. And here, statutory context clarifies we should include the periphery. Section 230(e)(2) uses the modifiers "any" and "pertaining to"—"any law pertaining to intellectual property." So not only are core intellectual property laws included, but so are laws *pertaining* to the subject. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214,

20

218–19 (2008) ("any"); *cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) ("relating to"). And not some of them—*any* of them. Thus the term's statutory context confirms our holding.

In conclusion, we hold that Hepp's statutory claim against Facebook arises out of a law pertaining to intellectual property. For that reason, the § 230(e)(2) limit applies, and Facebook is not immune under § 230(c). So we will reverse the District Court's order dismissing Hepp's amended complaint against Facebook with prejudice.

### D

We close by emphasizing the narrowness of our holding. First, it does not threaten free speech. Hepp's statutory claim against Facebook clarifies the point. She alleges her likeness was used to promote a dating service in an advertisement. And she claims that misappropriated the effort she spent to build a valuable reputation, so it could confuse consumers by suggesting she endorses the service. Again, the analogy to trademark is striking. Just as a counterfeit item can misappropriate a trademark owner's goodwill, so too might the unauthorized use of Hepp's image in the ad. Further, both misappropriations could create consumer confusion and undercut efficient incentives. In this way, trademark claims typically avoid violating free speech by addressing misleading commercial speech. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1018 (3d Cir. 2008). So too for Hepp's statutory claim against Facebook. Thus, Hepp's statutory claim against Facebook is about the commercial effect on her intellectual property, not about protected speech.

21

Second, our holding does not open the floodgates. Pennsylvania's statute is limited. For instance, it provides a right of publicity cause of action only for those whose valuable interest in their likeness "is developed through the investment of time, effort, and money." 42 PA. CONS. STAT. § 8316(e). And we express no opinion as to whether other states' rights of publicity qualify as intellectual property as a matter of federal law.

Third, having resolved the appeal on statutory grounds, we offer no opinion about the Pennsylvania common law claim. Facebook and Hepp briefed that issue in the District Court, but neither party focused on it here. So it is best left to the District Court on remand.

\*　　\*　　\*

Section 230 does not preclude claims based on state intellectual property laws. Hepp's statutory claim against Facebook fits that bill. For that reason, we will reverse in part the District Court's order dismissing her complaint with prejudice as to her statutory claim against Facebook. But the District Court lacked personal jurisdiction over the other parties, so they should be dismissed for lack of jurisdiction. And we will vacate the District Court's orders regarding leave to amend and Hepp's common law claim against Facebook. Finally, we will remand for further proceedings consistent with this opinion.

22

APPENDICES

A

1. A category of intangible rights protecting commercially valuable products of the human intellect. • The category comprises primarily trademark, copyright, and patent rights, but also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition.

2. A commercially valuable product of the human intellect, in a concrete or abstract form, such as a copyrightable work, a protectable trademark, a patentable invention, or a trade secret.

*Intellectual Property*, BLACK'S LAW DICTIONARY (7th ed. 1999).

1. A category of intangible rights protecting commercially valuable products of the human intellect. • The category comprises primarily trademark, copyright, and patent rights, but also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition. . . . .

2. A commercially valuable product of the human intellect, in a concrete or abstract form, such as a copyrightable work, a protectable

trademark, a patentable invention, or a trade secret.

*Intellectual Property*, *id.* (8th ed. 2004); *id.* (9th ed. 2009); *id.* (10th ed. 2014); *id.* (11th ed. 2019).

Those property rights which result from the physical manifestation of original thought.

*Intellectual Property*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969).

Intellectual property comprises two subdivisions: industrial property and copyright. Industrial property includes patents, inventions, trademarks, and industrial designs. Copyrights are property rights in literary, musical, artistic, photographic, and film works as well as in maps and technical drawings.

*Intellectual Property*, DICTIONARY OF MODERN LEGAL USAGE (2d ed. 1995)

Protection under the law for interests in creations and inventions. Intellectual property is the whole set of intangible rights that authors, inventors, and other creators have in the items they write, invent, or create. To have intellectual property in a thing is to have an effective monopoly on its use, such that the property rights holder may enjoin or recover from others who infringe on the rights through unfair duplication or wrongful use. Intellectual property in anything is usually limited in time, although the lengths of time and

24

manner of calculation vary dramatically among and within the categories.

Intellectual property is usually divided among three categories: copyright, patent, and trademark. In the United States, each is the province of federal regulation, as well as the common law. There is also a growing field of international law regulating intellectual property both as a field of international agreements unto itself and as an aspect of the regulation of trade.

*Intellectual Property*, THE WOLTERS KLUWER BOUVIER LAW DICTIONARY (2012).

[patent—trademark—unfair competition—copyright—trade secret—moral rights] Certain creations of the human mind that are given the legal aspects of a property right. "Intellectual property" is an all-encompassing term now widely used to designate as a group all of the following fields of law: patent, trademark, unfair competition, copyright, trade secret, moral rights, and the right of publicity.

*Intellectual Property*, MCCARTHY'S DESK ENCYCLOPEDIA OF INTELLECTUAL PROPERTY (1991) (square brackets in the original).

B

1. Any of various products of the intellect that have commercial value, including copyrighted property such as literary or artistic works, and

25

ideational property, such as patents, business methods, and industrial processes.

2. The set of rights protecting such works and property from unlawful infringement.

*Intellectual Property*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011).

A product of the intellect that has commercial value, including copyrighted property such as literary or artistic works, and ideational property, such as patents, appellations of origin, business methods, and industrial processes.

*Intellectual Property*, *id.* (4th ed. 2009)

Law. Property that results from original creative thought, as patents and trademarks.

*Intellectual Property*, RANDOM HOUSE WEBSTER'S SCHOOL AND OFFICE DICTIONARY (1999).

Property (as an idea, invention, or process) that derives from the work of the mind of intellect; also: an application, right, or registration relating to this.

*Intellectual Property*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).

A general name for property (such as patents, trademarks, and copyright material) which is the

product of invention or creativity, and which does not exist in a tangible, physical form.

*Intellectual Property*, OXFORD ENGLISH DICTIONARY (2d ed. 1989).

Property (such as patents, trademarks, and copyright material) which is the product of invention or creativity, and does not exist in a tangible, physical form.

*Intellectual Property*, *id.* (3d ed. 2010).

COWEN, *Circuit Judge,* concurring in part and dissenting in part.

I concur in Section III (and Footnote 1 to the extent it affirms the District Court's dismissal of the claims against WGCZ for lack of personal jurisdiction) of the majority opinion. However, I must respectfully dissent from Section IV of the opinion. I believe that the "intellectual property" exception or exclusion to immunity under § 230(e)(2) of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property"), is limited to federal intellectual property laws (i.e., federal patent, copyright, and trademark laws) and—at most—state laws only where they are co-extensive with such federal laws. Because Hepp's statutory and common law "right of publicity" claims under Pennsylvania law are clearly not co-extensive with federal intellectual property laws, the exception does not apply, and Facebook (as well as NKL Associates, S.R.O. ("NKL")) are entitled to immunity.[1]

Initially, the majority indicates that there is a circuit split between the First and Ninth Circuits regarding the scope of § 230(e)(2). However, there is no existing split in the

---

[1] While Facebook argues that the exception applies to federal and co-extensive state intellectual property laws, Imgur, Reddit, and WGCZ contend that the exception only applies to federal claims (and Amicus EFF contends that it is limited to patent and copyright claims). Because the claims at issue here are not co-extensive with federal intellectual property laws, I need not—and do not—decide which approach is correct.

circuits on this issue.  On the contrary, it is the majority that creates such a split.

In Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102 (9th Cir. 2007), the Ninth Circuit did conclude that the intellectual property exception "includes only '*federal* intellectual property.'"  (Majority Opinion at 12 (quoting Perfect 10, 488 F.3d at 1119).)  The circuit court succinctly and persuasively explained why it construed "the term 'intellectual property' to mean 'federal intellectual property'":

> The CDA does not contain an express definition of "intellectual property," and there are many types of claims in both state and federal law which may—or may not—be characterized as "intellectual property" claims. While the scope of federal intellectual property law is relatively well-established, state laws protecting "intellectual property," however defined, are by no means uniform.  Such laws may bear various names, provide for varying causes of action and remedies, and have varying purposes and policy goals.  Because material on a website may be viewed across the Internet, and thus in more than one state at a time, permitting the reach of any particular state's definition of intellectual property to dictate the contours of this federal immunity would be contrary to Congress's expressed goal of insulating the development of the Internet from the various state-law regimes.  See 47 U.S.C. § 230(a) and (b); see also [Batzel v. Smith, 333 F.3d 1018, 1027 (9th Cir. 2003)] (noting that

2

"courts construing § 230 have recognized as critical in applying the statute the concern that lawsuits could threaten the 'freedom of speech in the new and burgeoning Internet medium'" (quoting [Zeran v. Am. Online, Inc., 129 F.3d 327, 331 (4th Cir. 1997)])). In the absence of a definition from Congress, we construe the term "intellectual property" to mean "federal intellectual property."

Id. at 1118-19 (footnote omitted). Accordingly, the Perfect 10 court determined that the defendants "are eligible for CDA immunity for all of the state claims [i.e., unfair competition, false advertising, and right of publicity claims] raised" by the plaintiff. Id. at 1119.

The majority also states that the First Circuit "held § 230(e)(2) preserved the state law claim." (Id. (discussing Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413 (1st Cir. 2007)).) Unlike the Ninth Circuit, the First Circuit simply stated without any further discussion (or even acknowledgement that there could be an issue regarding the scope of the statutory exception) that:

Claims based on intellectual property laws are not subject to Section 230 immunity. See [§ 230(e)(2)] ("Nothing in this section shall be construed to limited or expand any law pertaining to intellectual property."); see also Gucci Am., Inc. v. Hall & Assocs., 135 F. Supp. 2d 409, 413 (S.D.N.Y. 2001) (finding that the "plain language of Section 230(e)(2) precludes [the defendant's] claim of immunity" from a

3

claim for trademark infringement).

Universal Commc'n, 478 F.3d at 422-23.  It then noted that, while the district court held that the claim was in effect a defamation claim and that defendants thereby would be shielded from the claim by CDA immunity, "[w]e reason somewhat differently, holding that even though Section 230 immunity does not apply, the claim was properly dismissed as a matter of trademark law."  Id. at 423 n.7.

The Ninth Circuit itself addressed Universal Communication in disposing of the plaintiff's unsuccessful petition for rehearing.  Initially, it noted that "neither party in that case raised the question of whether state law counts as 'intellectual property' for purposes of § 230 and the court seems to simply have assumed that it does."  Perfect 10, 488 F.3d at 1119 n.5.  The Perfect 10 court further observed that "Universal Communication demonstrates the difficulties inherent in allowing state laws to count as intellectual property for CDA purposes"—and in the process reiterated its concern about the disparate nature of putative state "intellectual property" laws:

> We note that Universal Communication demonstrates the difficulties inherent in allowing state laws to count as intellectual property for CDA purposes.  In that case, the district court struggled with the question of whether the "trademark dilution" claim brought under Florida Law counted as intellectual property for purposes of the CDA, and concluded that it was more like a defamation claim than a trademark claim.  [Universal

4

Commc'n, 478 F.3d at 423 n.7]. Rather than decide how to draw the line between defamation and trademark, the First Circuit held that "because of the serious First Amendment issues that would be raised" if Lycos were found liable, defendant had not violated the Florida statute. Id. at 423.

The First Circuit was able to sidestep the question of what counted as intellectual property on First Amendment grounds. But we cannot do so here. States have any number of laws that could be characterized as intellectual property laws: trademark, unfair competition, dilution, right of publicity and trade defamation, to name just a few. Because such laws vary widely from state to state, no litigant will know if he is entitled to immunity for a state claim until a court decides the legal issue. And, of course, defendants that are otherwise entitled to CDA immunity will usually be subject to the law of numerous states. An entity otherwise entitled to § 230 immunity would thus be forced to bear the costs of litigation under a wide variety of state statutes that could arguably be classified as "intellectual property." As a practical matter, inclusion of rights protected by state law within the "intellectual property" exemption would fatally undermine the broad grant of immunity provided by the CDA.

Id. at 1119 n.5. (See also id. at 12 ("Ultimately, the [First Circuit] held 'that even though Section 230 immunity does

5

not apply, the claim was properly dismissed as a matter of [Florida] trademark law' 'because of the serious First Amendment issues that would be raised by allowing [Plaintiff's] claim.'" (quoting Univ. Commc'n, 478 F.3d at 423 & n.7)).)

Instead of simply applying its purported holding concerning the scope of § 230(e)(2) and state laws, the First Circuit subsequently assumed "without deciding" that the plaintiffs' remaining state law claims "come within the compass of this exception." Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 26 (1st Cir. 2016). It recognized that "[t]he application of the exemption to the appellants' state law claims for the unauthorized use of pictures is not free from doubt." Id. at 26 n.9. "At least one court of appeals has suggested that state law intellectual property claims are not covered by this exemption. See [Perfect 10, 488 F.3d at 1118-19, 1119 n.5]; but cf. Lycos, 478 F.3d at 422-23, 324 n.7 (applying section 230(e)(2) to a claim under state trademark law, albeit without detailed analysis)." Backpage.com, 817 F.3d at 26 n.9. In fact, "Backpage argues that the unauthorized use of pictures claims do not involve intellectual property but, rather, stem from property rights protected by tort law." Id. Upholding the dismissal of the plaintiff's claims under state law, the First Circuit explained that "[w]e need not reach either of these issues." Id.; see also Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1324 (11th Cir. 2006) (stating that, while district court should have addressed § 230(e)(2) before invoking grant of immunity, it was unnecessary to address difficult issue of applying CDA because Florida right of publicity claim would not withstand motion to dismiss under state law).

6

While there may be district court cases (like <u>Atlantic Recording Corp. v. Project Playlist, Inc.</u>, 603 F. Supp. 2d 690 (S.D.N.Y. 2009)) that have applied the intellectual property exception to state law claims, we are the first circuit court to take such a step. The majority takes issue with Facebook's assertion that its reading would increase uncertainty about the precise contours of immunity in cases involving purported state intellectual property laws. However, the 2007 <u>Perfect 10</u> decision was the only circuit court clearly on point, and it kept the proverbial door closed on a potential influx of disparate and downright confusing state law "intellectual property" claims that would be contrary to Congress's express goals in enacting § 230. <u>Perfect 10</u>, 488 F.3d at 1118-19 & n.5. We now open this door and, as I explain in more detail below, this drastic step undermines the broad policy objectives codified in § 230.

"Facebook's appeal to text and structure rightly urges us to read § 230 as an integrated whole." (Majority Opinion at 13.) In short, the other immunity exceptions set forth under subsection (e) refer to only specified federal laws and, in certain instances, to co-extensive state laws. Accordingly, § 230(e)(1) states that "Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute." Section 230(e)(4) states that "Nothing in this section shall be construed to limit the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law." Section 230(e)(5) provides that "Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit" either "(A) any claim in a civil action brought under

7

section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title," "(B) any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of Title 18," or "(C) any charge in a criminal prosecution under State law if the conduct underlying the charge would constitute a violation of Section 2421A of Title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted." Given such narrowly circumscribed categories, should § 230(e)(2) be read to apply to "any number of [disparate state] laws that could be characterized as intellectual property laws: trademark, unfair competition, dilution, right of publicity and trade defamation, to name just a few"—which all have "varying causes of action and remedies, and have varying purposes and policy goals," Perfect 10, 488 F.3d at 1118, 1119 n.5? Would Congress have really gone so far as to grant immunity from a wide range of state and federal laws—including state criminal law—yet permit claims to go forward under the nebulous (and expansive) category of state "intellectual property"/"rights of publicity" laws?[2]

---

[2] In fact, counsel for Facebook points out at oral argument that Congress specified as part of the Defend Trade Secrets Act of 2016 that the amendments made by this statute "shall not be construed to be a law pertaining to intellectual property for purposes of any other Act of Congress." 18 U.S.C. § 1833 Statutory Note. In turn, the Digital Millennium Copyright Act of 1998 "provides for a carefully balanced system of notices, takedowns, and counternotices [with respect to purported copyright infringement] that allows platforms to host users' speech with relative confidence."

8

The majority acknowledges that "the structural evidence [Facebook] cites cuts both ways." (Majority Opinion at 14.) However, the codified findings and policies clearly tilt the balance in Facebook's favor. I believe that the more expansive interpretation would gut the immunity system established by Congress and undermine the policies and findings that Congress chose to codify in the statute itself.

The "Findings" and "Policy" explicitly set forth in § 230(a) and (b) emphasize, inter alia, the importance of the Internet, its continued development, the free exchange of information, and the need to keep governmental regulation of this forum to a minimum:

**(a) Findings**

The Congress finds the following:

**(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive,

---

(Amicus EFF's Brief at 17 (addressing 17 U.S.C. § 512).) Given these restrictions, how could one conclude that § 230(e)(2) is applicable to a wide range of state "intellectual property" laws (including right of publicity claims)?

9

as well as the potential for even greater control in the future as technology develops.

**(3)** The Internet and other interactive services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States—

**(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

**(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

10

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

§ 230(a)-(b).

"The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" Perfect 10, 488 F.3d at 1118 (quoting Almeida, 456 F.3d at 1321 (quoting Zeran, 129 F.3d at 331)). In short, Congress—concerned about protecting and encouraging the freedom of expression in a new and important forum of speech—meant to protect and encourage such speech unfettered by the burden of intrusive governmental regulation in the form of civil litigation and liability. In one of the first cases to interpret § 230, the Fourth Circuit undertook a thorough and persuasive examination of the purpose of the statutory immunity established by Congress. The Zeran court

11

concluded that § 230 barred the plaintiff's defamation claim against the service provider. Zeran, 129 F.3d at 328. As the Fourth Circuit explained, "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium." Id. at 330. "The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech," and "Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum." Id. (quoting § 230(a)(3), (a)(4), (b)(2)). While observing that "the original culpable party who posts defamatory messages would [not] escape accountability," the Zeran court stated that "Congress made a policy choice, however, not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." Id. at 330-31. Furthermore, the Fourth Circuit observed that "[i]nteractive computer services have millions of users" and that "[t]he amount of information communicated via interactive computer services is therefore staggering." Id. at 331 (citing Reno v. ACLU, 521 U.S. 844, 850-51 (1997)). The possibility of tort liability in such a context would have an obvious chilling effect, with service providers (who could not possibly screen each of their millions of postings) possibly forced to impose severe restrictions on such on-line speech. Id. "Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect." Id. (stating that other purpose of legislation is to encourage providers to self-regulate dissemination of offensive material); see also, e.g., Universal Commc'n, 478 F.3d at 418-19 (relying on Zeran to find that § 230 immunity

12

should be broadly construed).

The application of § 230(e)(2) to various state "intellectual property" laws would be inconsistent with the objectives of § 230. On the one hand, federal intellectual laws are relatively well established. As Amicus EFF explains in some detail, "copyrights and patents are relatively clear, relatively knowable, and embody a longstanding balance between rightsholders, future creators and inventors, and the public at large."[3] (Amicus EFF's Brief at 14-15.) In turn,

---

[3] Federal patent and copyright laws: (1) are specifically authorized by the Constitution, which mandates that such exclusive rights must "promote the Progress of Science and the useful Arts," U.S. Const. art. I, § 8, cl. 8; (2) are traditionally viewed as sharing a common origins in Venetian monopolies from the 1400s and 1500s (see EFF's Amicus Brief at 8-9 (citing Joanna Kostlyo, From Gunpowder to Print: The Common Origins of Copyright & Patent, Privilege & Property: Essays on the History of Copyright (Ronan Deazly et al. eds., 1st ed. 2010) (available at https://jstor.org/stable/j.ctt5vjt9v.5))); (3) embody a fundamental bargain in which the government grants a limited monopoly to encourage and reward creativity and innovation and then provides that the public gets the benefit of such efforts after the monopoly's expiration, see, e.g., Fogerty v. Fantasy, Inc., 510 U.S. 517, 524 (1994) ("The primary objective of the Copyright Act is to encourage the production of original literary, artistic, and musical expression for the good of the public." (citation omitted)); Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 9 (1966) ("The patent monopoly was not designed to secure to the inventor his natural right in his discoveries. Rather, it was

13

Facebook notes that "[a] trademark is a very unique type of property." Pirone v. MacMillan, Inc., 894 F.2d 579, 581 (2d Cir. 1990). A trademark is defined by the Lanham Act as "any word, name, symbol, or device, or any combination thereof" used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." [4] 15 U.S.C. § 1127; see also, e.g., Pirone, 894 F.2d at 581 (explaining that trademark is not property in ordinary sense and, like majority, highlighting role of consumer confusion). On the other hand,

a reward, an inducement, to bring forth new knowledge."); (4) are limited in scope (with copyrights available for expressive works as set forth in the Copyright Act, see, e.g., Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 344-61 (1991), and patents available for new, useful, and non-obvious inventions concerning certain subject matter, see, e.g., Bonito Boats v. Thunder Craft Boats, Inc., 489 U.S. 141, 146-56 (1989); (5) involve exclusive rights that are secured (as the Constitution mandates) for "limited Times;" (6) are obviously (as federal statutes) national in application; and (7) are alienable, see, e.g., 17 U.S.C. § 201(d); 35 U.S.C. § 261.

[4] I note that the Ninth Circuit has ruled that § 230(e)(2) "does not apply to false advertising claims brought under § 1125 of the Lanham Act, unless the claim itself involves intellectual property" (although it does apply to claims pertaining to an established intellectual property right under federal law, including "those inherent in a . . . trademark"). Enigma Software Grp. USA, LLC v. Malwarebytes, Inc., 946 F.3d 1040, 1053 (9th Cir. 2019), cert. denied, 141 S. Ct. 13 (2020).

"state laws protecting 'intellectual property,' however defined, are by no means uniform," with such laws bearing various names (e.g., trademark, unfair competition, dilution, and right of publicity), legal elements, remedies, and purposes. Perfect 10, 488 F.3d at 1118-19 & n.5. Such confusion is only magnified by the fact that "material on a website may be viewed across the Internet, and thus in more than one state at a time," and "defendants that are otherwise entitled to CDA immunity will usually be subject to the law of numerous states." Id. Permitting litigation and liability under such a tangle of disparate state law schemes would threaten "the continued development of the Internet" as well as "the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation"—even though Congress found that the "Internet and other interactive services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity" and that the Internet has flourished to the benefit of all Americans, "with a minimum of government regulation." § 230(a)(3), (4), (b)(1), (2). In other words, the imposition of such liability would simply constitute "another form of intrusive government regulation of speech," which Congress sought to prevent in the first place. Zeran, 129 F.3d at 330.

"This web of inconsistent state laws is the very definition of the 'fettering' state regulation that Congress sought to avoid in enacting Section 230."[5] (Facebook's Brief

---

[5] The majority recognizes that Congress enacted a pro-free-market policy. But it contends that Facebook downplays the role of property in the functioning of a free market, noting

15

at 25 (quoting § 230(b)(2)). In fact, "right of publicity" laws epitomize this "web" of disparate state laws.

"The appearance of near-uniformity in the adoption of some version of the right of publicity belies the degree to which the exact contours of the right differ significantly from jurisdiction to jurisdiction." Karyn A. Temple, U.S. Copyright Off., <u>Authors, Attribution, and Integrity: Examining Moral Rights in the United States</u>, at 115 (2019), https://wwww.copyright.gov/policy/moralrights/full-report.pdf (citing Joshua L. Simmons & Miranda D. Means, <u>Split Personality: Constructing a Coherent Right of Publicity Statute</u>, Landside, at 38 (May/June 2018), https://www.americanbar.org/groups/intellectual_property_la w/publications/landside/2017-18/may-june/split-personality/)). For example, some states specifically define the aspects of a person's identity that may serve as the basis for the claim, <u>see, e.g.</u>, Okla. Stat. Ann. tit. 12, § 1449(A) ("name, voice, signature, photograph, or likeness"); 42 Pa. Cons. Stat. Ann. § 8316(a) ("name or likeness"), while other states evidently bar uses that merely evoke a person, like a modified race car, <u>see</u> <u>Motschenbacher v. R.J. Reynolds Tobacco Co.</u>, 498 F.2d 821 (9th Cir. 1974), or a celebrity catch-phrase, <u>see</u> <u>Carson v. Here's Johnny Portable Toilets</u>, 698 F.2d 831 (6th Cir. 1983). "And while most states historically view the right as nondescendible, the modern trend holds it capable of surviving the death of the celebrity."

---

that "state property laws—along with contract laws—enable the resulting formation of effective markets.'" (Majority Opinion at 15 (quoting <u>Ford Motor Co. v. Mont. Eighth Jud. Dist Ct.</u>, 141 S. Ct. 1017, 1029 (2021)).) I note, however, that § 230(e) does not include a "contract" exception.

Stacey L. Dugan & Mark Lemley, <u>What the Right of Publicity Can Learn from Trademark Law</u>, 58 Stan. L. Rev. 1161, 1174 (2006) (citing 1 J. Thomas McCarthy, <u>The Rights of Publicity & Privacy</u> § 9:18 (2d ed. 2005)); <u>see also</u> § 8316(b)(3), (c) (providing for survival of action after person's death with repose period of 30 years). Other differences include whether a claim of right must be registered in order to pursue a posthumous claim, whether the claimant must live in the state whose law he or she wishes to invoke, and whether the claimant needs to prove sufficient fame or show that his or her persona has economic value. Temple, <u>supra</u>, at 115-16; <u>see also, e.g.</u>, § 8316(a) ("[a]ny natural person whose name or likeness has commercial value").

These differences are not surprising given the confusion that exists regarding the specific basis of the right of publicity. "In enacting right of publicity statutes, commentators have noted that many states struggled to adopt a strong, consistent theory of why the right exists and what it should be designed to protect." Temple, <u>supra</u>, at 115 n.652 (quoting Simmons & Means, <u>supra</u>, at 38). Amicus SAG-AFTRA acknowledges that the right of publicity "derived originally from laws protecting one's privacy." (Amicus SAG-AFTRA's Brief at 18.) Especially when compared with patent and copyright laws, this area of the law is relatively new. <u>See, e.g.</u>, Dugan & Lemley, <u>supra</u>, at 1167 ("Before the late nineteenth century, individuals had little recourse against the use of their names or images by unauthorized parties."). As the law review article cited by the majority indicated, the right had its origins in the famous 1890 law review article by Samuel Warren and future Justice Louis Brandeis proposing a new "Right to Privacy." <u>Id.</u> at 1167-68 (citing Samuel D. Warren & Louis D. Brandeis, <u>The Right to Privacy</u>, 4 Harv.

17

L. Rev. 193 (1890)). "Although their article occasionally strayed into broad generalities suggesting that individuals should have property rights in their personalities, their proposed cause of action focused narrowly on the problem at hand: 'to protect the privacy of private life.'" Id. at 1168-69 (quoting Warren & Brandeis, supra, at 215). Accordingly, § 625C of the Restatement (Second) of Torts provides that "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of privacy." While recognizing that the right is in the nature of a property right, Comment a to this section goes on to state that "the protection of his personal feelings against mental distress is an important factor leading to a recognition of the rule."[6] See also Corabi v. Curtis Publ'g Co., 273 A.2d 899, 918 (Pa. 1971) (addressing Restatement), abrogation on other grounds recognized by Am. Future Sys. v. Better Bus. Bureau of E. Pa., 923 A.2d 389 (Pa. 2007). Furthermore, it is clear that, at least in certain states, the right of publicity is particularly broad in nature—and certainly broader than the purported federal counterparts.[7] See, e.g., White v. Samsung

---

[6] Hepp similarly alleged (as the majority recognizes) that her likeness was used to promote a dating service, thereby misappropriating the effort she spent to build a valuable reputation (which could confuse consumers by suggesting that she endorses the service). However, she also alleged that "Defendants' sexualization of Plaintiff's image and use for prurient and illicit purposes is abhorrent and disgusting." (A61.)

[7] Amicus EFF asserts that, "despite the Supreme Court's rough analogy in [Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977), between rights of

18

Elec. Am., Inc., 989 F.2d 1512, 1514 (9th Cir. 1993) (Kozinski, J., dissenting from order rejecting suggestion for rehearing en banc) ("[I]t's now a tort for advertisers to *remind* the public of a celebrity. Not to use a celebrity's name, voice, signature or likeness; not to imply the celebrity endorses a product; but simply to evoke the celebrity's image in the public's mind. This Orwellian notion withdraws far more from the public domain than prudence and common sense allow. It conflicts with the Copyright Act and the Copyright Clause. It raises serious First Amendment problems. It's bad law, and it deserves a long, hard second look.").

---

publicity on the one hand and patents and copyrights on the other hand], it is hard to see how publicity rights fulfill any public interest in promoting creativity or invention, rather than a general interest in protecting people against unfair commercial exploitation and unwanted attention." (Amicus EFF's Brief at 13.) "Celebrities do not need any special incentive to have a public identity, nor do regular people." (Id.) Dugan and Lemley likewise rejected this "incentive/copyright model" for right of publicity claims. Dugan & Lemley, supra, at 1186-90. According to them, there was no empirical evidence to show that celebrities would invest less energy and talent in becoming famous without a publicity right, id. at 1187-88, and, in any event, "it is not at all clear that society should want to encourage fame for fame's sake," id. at 1188 (footnote omitted) ("Unlike copyright law—which aims to promote the production of valuable works of authorship that enhance the quality of discourse and understanding in our society—the right of publicity rewards those who, with luck, hard work, or accident of birth, happen to join the ranks of the famous." (footnote omitted)).

19

The majority attempts to limit the scope and effect of its ruling. Accordingly, it contends that its holding neither threatens free speech nor opens the proverbial floodgates. "And we express no opinion as to whether other states' rights of publicity qualify as intellectual property as a matter of federal law." (Majority Opinion at 22.) The majority likewise offers no opinion about Hepp's Pennsylvania common law claim.

However, this decision—which it bears repeating is the first circuit court ruling to hold that the intellectual property exception applies to state "intellectual property" laws (specifically including at least one state's right of publicity statute) and in the process to reject the Ninth Circuit's holding in Perfect 10—does threaten to open the floodgates. Internet service providers now face the prospect that so troubled the Ninth Circuit—"Because such laws vary widely from state to state, no litigant will know if he is entitled to immunity for a state claim until a court decides the legal issue." Perfect 10, 488 F.3d at 1119 n.5. In this case, Facebook does not even know whether Hepp's common law right of publicity claim falls under § 230(e)(2). Such uncertainty as well as the probability of additional litigation in the future together with the real possibility of being held liable under disparate and often very expansive state law "intellectual property" regimes would encourage internet service providers to censor more content—even though Congress "recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium," enacted § 230 "to maintain the robust nature of Internet communication, and, accordingly, to keep government interference in the medium to a minimum," and

20

made the policy choice "not to deter online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." Zeran, 129 F.3d at 330-31. The fact that "defendants that are otherwise entitled to CDA immunity will usually be subject to the law of numerous states," Perfect 10, 388 F.3d at 1119 n.5, only further compounds the pressure to restrict speech.

Section 230 "paved the way for a robust new forum for public speech as well as 'a trillion-dollar industry centered around user-generated content.'" Bennett v. Google, LLC, 882 F.3d 1163, 1166 (D.C. Cir. 2018) (quoting Eric Goldman & Jeff Kosseff, Commemorating the 20th Anniversary of Internet Law's Most Important Judicial Decision, The Recorder (Nov. 10, 2017), perma.cc/RR2M-UZ2M). The Internet has seen "staggering" growth since the 1990s. (See, e.g., Amicus SAG-AFTRA's Brief at 16-17 (noting that there were about 40 million Internet users in 1997 but that, in 2020, there are roughly 4.66 billion users).) Even Hepp acknowledges that "it may be true that the protections afforded Internet-based Internet companies under § 230 of the CDA initially played a crucial role in creating what is now the modern Internet." (Appellant's Brief at 16-17; see also id. at 16 ("In 2007, when Perfect 10 was decided, the Internet with its concomitant limitless potential for opening portals for commerce, public discourse, science, education and other areas, was in its adolescence.").) The parties and their respective amici dispute whether the protections of § 230 are still necessary and whether the negative consequences of immunity in this context (continue to) outweigh its positive effects (including whether or not the technology necessary to monitor and remove materials from their sites is readily

21

available).  However, these are all matters for Congress—and not the courts—to address.

Under the circumstances, I have no choice but to follow the Ninth Circuit's example and conclude that § 230(e)(2) is limited to federal intellectual property laws and—at most—state laws only where they are co-extensive with such federal laws.  Because Pennsylvania's right of publicity law clearly is not co-extensive with federal intellectual property law,[8] I would affirm the District Court's dismissal of Hepp's claims against Facebook as well as its denial of the motion to amend with respect to NKL.

---

[8] Although the majority compares the right of publicity to patent, copyright, and (especially) trademark rights, they clearly are not the same thing.

22